## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-152-APM** |
| **WILLIAM TODD WILSON,** | |
| **Defendant.** | |

### GOVERNMENT'S SENTENCING MEMORANDUM AND
### MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence William Todd Wilson to 12 months of incarceration, followed by three years of supervised release, during which time he must pay $2,000 in restitution and the mandatory $200 special assessment. Such a sentence would be sufficient to reflect the seriousness of this offense while also accounting for the defendant's acceptance of responsibility and substantial assistance to law enforcement pursuant to his cooperation plea agreement.

## I.    INTRODUCTION

On the afternoon of January 6, when it became clear that Congress was going forward with the certification of the 2020 presidential election, Defendant Wilson joined the mob of rioters that breached the United States Capitol through the upper west terrace doors. The defendant's participation in the attack on the Capitol was not random; it was the culmination of weeks, if not months of following the increasingly violent calls by Elmer Stewart Rhodes III, a leader of a group called the Oath Keepers, to oppose the lawful transfer of power from Donald Trump to Joseph

1

Biden. Wilson was privy to these communications because he was a regional leader of the Oath Keepers from North Carolina, and he was in touch with Rhodes directly, prior to January 6. Defendant admitted, through his guilty plea, that he entered the Capitol with the goal of disturbing the certification proceeding and that he participated in a conspiracy with Rhodes and others to oppose by force the lawful transfer of presidential power. For these reasons, he pled guilty to Seditious Conspiracy, in violation of 18 U.S.C. § 2384, and Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2).

Such conduct merits a significant sentence of incarceration. Defendant Wilson deserves credit for his acceptance of responsibility and the assistance he provided law enforcement, as described below. However, the government believes a sentence of incarceration is appropriate for his role in this grave offense.

## II.    THE IMPACT OF *FISCHER*

Since Wilson's guilty plea, in *United States v. Fischer*, the Supreme Court held that to prove a violation of 18 U.S.C. § 1512(c)(2) "the Government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or as we earlier explained, other things used in the proceeding, or *attempted* to do so." 603 U.S. ----, 144 S. Ct. 2176 (June 28, 2024) (emphasis added). The parties agree that the facts admitted to by Wilson in his statement of offense during his guilty plea are sufficient to establish an attempted violation of Section 1512(c)(2). Nonetheless, out of an abundance of caution, the government would suggest that, at the start of the sentencing hearing, the Court place Wilson under Oath to make sure he understands the elements of the offense of obstruction of an official proceeding, as clarified by the Supreme Court in *Fischer*, and to have the parties declare on the

2

record their position that there is a sufficient factual basis to support Wilson's guilty plea.

### III.    FACTUAL BACKGROUND

#### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF 4, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the 2020 presidential election.

#### B.    The Defendant's Role in the January 6, 2021 Attack on the Capitol

After the 2020 presidential election, Wilson joined into a conspiracy with Rhodes and other members and affiliates of the Oath Keepers to oppose by force the lawful transfer of presidential power from Donald Trump to Joseph Biden. In furtherance of this conspiracy, Wilson traveled to D.C. and joined the attack on the Capitol on January 6 with the goal of disrupting Congress' certification of the election. Wilson then destroyed evidence of his involvement in the attack.

Beginning in November 2020, Rhodes began disseminating messages on end-to-end encrypted meeting and messaging applications, including GoToMeeting and Signal, that encouraged other Oath Keepers members and affiliates to oppose by force the lawful transfer of presidential power. ECF 4 at ¶5. For example, on November 5, 2020—two days after the Presidential Election—Rhodes urged members of the "Leadership Intel Sharing Secured" chat ("Leadership Intel Chat"), which included Wilson, to reject the presidential election result and stated, "We aren't getting through this without a civil war. Too late for that. Prepare your mind, body, spirit." *Id.* at ¶7. On November 9, 2020, Rhodes held a private GoToMeeting titled, "Oath Keepers National Call - Members Only," which was attended by Wilson and other co-conspirators. *Id.* at ¶8. During the meeting, Rhodes outlined a plan to stop the lawful transfer of power, including

3

preparations for the use of force, and urged those listening to participate: "You're from Oath Keepers. You got a responsibility and duty. You raised your freaking right hand. You swore that oath . . . you got to fight." *Id.* That same day, in reference to a post in the "NC Members" Signal chat that the Georgia state election result was announced in favor of President Biden, Wilson replied, "how in the damn hell?" ECF 4 at ¶9. Another member of the chat explained, "Folks, the machine was set to ensure Trump couldn't win. Remember that the Coyote Rules applies to every kind of crime: For every coyote you see, you have five." *Id.* Wilson responded, "Rigged," followed by, "I'm ready to go coyote hunting." *Id.*

On December 14, 2020—the same day that presidential electors from each state and the District of Columbia cast their votes in the Presidential Election—Rhodes published a letter on the Oath Keepers website advocating for the use of force to stop the lawful transfer of presidential power. He made similar posts that day to the Leadership Intel Chat. ECF 4 at ¶11. That same day, in response to an article posted by a group member in the Leadership Intel Chat titled, "General Flynn warns of unelected 'tyrants,' says 'time for Godfearing Americans to fight,'" Wilson replied, "It is time to fight!" *Id.* at ¶12. Two weeks later, on December 30, 2020, Wilson posted to the Leadership Intel Chat: "Things are about get real! I believe the [poop emoji] is about to hit the fan and we need to be ready as ever!" *Id.* at ¶13.

On December 31, 2020, Rhodes added Wilson to an encrypted Signal chat called "DC OP: Jan 6 21." ECF 4 at ¶14. Rhodes described Wilson to the other group chat members as a "NC leader" and "experienced prior op veteran." *Id.* Rhodes, Wilson, and co-conspirators used this Signal group chat and others to plan for January 6, 2021. *Id.* Additionally, between January 4 and

4

January 6 of 2021, Wilson exchanged nearly two dozen calls with Rhodes, as well as numerous calls and texts with other co-conspirators. *Id.* at ¶17.

On the evening of January 4, Wilson and Rhodes engaged in multiple phone calls to finalize plans for attending the January 6 operation in Washington, D.C. ECF 4 at ¶18. During these conversations, Rhodes confirmed Wilson's hotel accommodations and told him to "come prepared." *Id.* Based on Rhodes' directive, on January 5, Wilson drove himself from North Carolina to the Washington, D.C. Metropolitan Area. ECF 4 at ¶19. Wilson brought with him on the trip an AR15-style rifle, a 9-millimeter pistol, approximately 200 rounds of ammunition, body armor, a camouflaged combat uniform, pepper spray, a large walking stick intended for use as a weapon, and a pocketknife. *Id.* While on his drive, Wilson declared to the DC OP: Jan 6 21 Signal group chat members, "It's going to hit the fan tonight!" *Id.* In response, another group chat member posted, "Not like it will tomorrow after the Senate vote." *Id.* Wilson replied, "That s why I have all my gear with me." *Id.*

That night, Wilson arrived at the Hilton Garden Inn Hotel in Vienna, Virginia. ECF 4 at ¶20. Rhodes, Wilson, and other leading Oath Keeper members and affiliates stayed in rooms at the hotel that Rhodes had reserved and paid for. *Id.* After arriving, Wilson informed Rhodes by phone that he would be storing his firearms in his hotel room. *Id.* Later that night, Wilson met with Rhodes, who told him that another North Carolina Oath Keeper leader was expected to participate in the "quick reaction force" ("QRF") on January 6. ECF 4 at ¶21. That same day, Wilson directly confirmed that plan by phone with the North Carolina Oath Keeper leader. *Id.* Wilson believed that, if called upon, the QRF would provide firearms or cover to co-conspirators (such as himself) operating inside of Washington, D.C. *Id.*

On the morning of January 6, 2021, at approximately 6:27 a.m., Rhodes confirmed to the members of the DC OP: Jan 6 21 Signal group chat, "We will have several well equipped QRFs outside DC. And there are many, many others, from other groups, who will be watching and waiting on the outside in case of worst case scenarios." ECF 4 at ¶23. Later that morning, Wilson, Rhodes, and other Oath Keepers leaders traveled together in the same car from their hotel in Virginia to Washington, D.C. *Id.* at ¶24. Wilson stored his firearms, ammunition, and combat gear in the hotel room, left his pepper spray and large stick in a co-conspirator's car parked nearby, and carried a pocketknife with him. *Id.* Wilson was prepared to retrieve his weapons for use in Washington, D.C., if called upon to do so. *Id.*

Shortly after 1:30 p.m., as rioters began to breach the building, Rhodes posted to the DC OP: Jan 6 21 Signal group chat: "Pence is doing nothing. As I predicted." ECF 4 at ¶28. Rhodes added, "All I see Trump doing is complaining. I see no intent by him to do anythmg. So the patriots are taking it into their own hands. They've had enough." *Id.*

About half an hour later, Wilson, Rhodes, and others bypassed barricades and Capitol Police officers and unlawfully entered the restricted grounds of the Capitol. ECF 4 at ¶31. While advancing, Wilson heard Rhodes proclaim that they were in the midst of a "civil war." *Id.* Through plumes of smoke, Wilson could see mobs of people climbing up scaffolding and descending on the Capitol. *Id.* Rhodes directed his other followers to meet him at the Capitol. *Id.*

At 2:34 p.m., Wilson entered the Capitol through the Upper West Terrace Doors—the first of the co-conspirators to breach the building. ECF 4 at ¶33. Wilson was armed with a pocketknife and wore a neck gaiter and beanie hat to mask his appearance. *Id.*



Wilson has admitted that he entered the Capitol with the goal of disturbing the Congressional proceeding and gathering intelligence, and that he took these actions in furtherance of the conspiracy to oppose by force the execution of the laws governing the transfer of presidential power, and in order to prevent, hinder, and delay the certification of President-Elect Joseph R. Biden as President of the United States. *Id.*

By 2:38 p.m., Wilson had marched through the Rotunda to the east side of the Capitol, where he joined in the center of a mob of people trying to push open the East Rotunda Doors from inside of the building (see individual circled in yellow on the next page below):



ECF 4 at ¶34. Two Capitol police officers stood in front of the closed doors attempting to keep the mob at bay. *Id.* A minute later, the Rotunda doors were forced open, and a mob of people forcibly entered the Capitol through the doors. ECF 4 at ¶36. The entering mob included fourteen Oath Keepers co-conspirators—many of whom were wearing paramilitary clothing and patches with the Oath Keepers name, logo, and insignia—who had moved up and through the crowd on the east side of the Capitol in a military-style "stack" formation ("Stack One"). *Id.* Wilson took cell phone video of them entering (see Wilson, circled in yellow in the first still photograph, and Stack One, circled in yellow in the second photograph, below):





*Id.* In the first photographs, it appears as though co-conspirators Kenneth Harrelson and Jason Dolan walk right by Wilson and briefly interact with him:



Wilson admitted in the statement of offense he adopted as part of his guilty plea that after Stack One entered the Capitol, he made brief contact with some of the co-conspirators, to include Jason Dolan and Kenneth Harrelson, then followed closely behind co-conspirators Kelly Meggs and Caleb Berry into the Rotunda. ECF 4 at ¶37. Wilson walked through the Capitol for the next fifteen minutes, at times interacting with Dolan, Harrelson, and other co-conspirators who were heading southbound toward the House of Representatives. *Id.* After exiting the Capitol at 2:55 p.m., Wilson gathered with Rhodes and several co-conspirators approximately 100 feet from the northeast corner of the Capitol. ECF 4 at ¶38. To Wilson, Rhodes seemed pleased that he and others had gone inside of the Capitol, stating to Wilson that "pissed off Patriots" were engaged in the still-unfolding attack on the Capitol. *Id.*

At approximately 5:00 p.m., Wilson, Rhodes, and others left the Capitol grounds and walked together to the Phoenix Hotel. ECF 4 at ¶43. There, Rhodes gathered Wilson and other co-conspirators inside of a private suite. *Id.* Rhodes then called an individual over speaker phone. *Id.* at ¶44. Wilson heard Rhodes repeatedly implore the individual to tell President Trump to call upon groups like the Oath Keepers to forcibly oppose the transfer of power. *Id.* This individual denied Rhodes' request to speak directly with President Trump. *Id.* After the call ended, Rhodes stated to the group, "I just want to fight." *Id.*

Later that night, Rhodes messaged the DC OP: Jan 6 21 Signal chat, "Patriots entering their own Capitol to send a message to the traitors is NOTHING compared to what's coming." ECF 4 at ¶46. Rhodes also told Wilson and other co-conspirators who had gathered with him in a restaurant in Virginia that they needed to prepare for a larger fight against the government akin to the American Revolutionary War. *Id.* at ¶47. While at the restaurant, the co-conspirators came to believe that law enforcement was searching for Rhodes and others in connection with the events earlier that day at the Capitol. *Id.* at ¶48. Before leaving the restaurant, one of the co-conspirators stated in front of Wilson and Rhodes that incriminating materials should be deleted from their cell phones. *Id.* The group immediately returned to their hotel, collected their belongings, and met at a nearby gas station. *Id.* Rhodes intentionally left his mobile phone with one person and departed with another person in their car. *Id.* Wilson, along with the other cars, departed from the gas station in separate directions. *Id.*

On January 7, 2021, after arriving at his home, Wilson took steps to conceal incriminating evidence of his participation in this conspiracy from being stored in his Apple iCloud account. ECF 4 at ¶49. In late January 2021, Wilson intentionally discarded his only cell phone into the

Atlantic Ocean to prevent law enforcement from discovering incriminating evidence about his participation in this conspiracy. *Id.* at ¶52.

## IV.     THE CHARGES AND PLEA AGREEMENT

On May 4, 2022, Wilson waived his right to be indicted and pled guilty to an Information charging him with one count of Seditious Conspiracy, in violation of 18 U.S.C. § 2384, and Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2).

## V.     STATUTORY PENALTIES

As noted by the Presentence Report issued by the U.S. Probation Office, Wilson faces up to 20 years of imprisonment on each count of conviction, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $200 for this offense.

## VI.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c) and § 1B1.1, cmt. (background). The Guidelines apply to a "heartland of typical cases." *Koon v. United States*, 518 U.S. 81, 94-95 (1996). A "departure" is based on "the framework set out in the Guidelines," while a "variance" is imposed "outside the guidelines framework" based under the applicable 18 U.S.C. § 3553(a) factors taken as a whole. *United States v. Murray*, 897 F.3d 298, 309 n.8 (D.C. Cir. 2018) (cleaned up).

### A.  Total Offense Level Calculation

The plea agreement calculated Wilson's total offense level as 26, resulting in a Guidelines

range of 63 to 78 months' imprisonment. However, between the time of the guilty plea and the filing of this sentencing memorandum, the D.C. Circuit decided *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024). *Brock* held that the term "administration of justice," as used in U.S.S.G. § 2J1.2, does not apply to Congress' certification of electoral college votes. *See id*. at *8. Accordingly, the enhancement in U.S.S.G. § 2J1.2(b)(2), which requires a three-level enhancement "[i]f the offense resulted in substantial interference with the administration of justice," does not apply where a defendant interfered solely with the certification of electoral college votes. U.S.S.G. § 2J1.2(b)(2); *Brock*, 2024 WL 875795, at *15. This holding also precludes application of the eight-level enhancement in U.S.S.G. § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," to defendants who interfered solely with Congress' certification of electoral college votes.

Because the modified Pre-Sentence Report ("PSR"), filed post-*Brock*, is as follows.

    a.  <u>Base Offense Level and Grouping</u>

For the reasons articulated in the PSR, the same Guidelines apply to both Counts One and Two. There is no guideline provision expressly promulgated for seditious conspiracy. Under U.S.S.G. 2X5.1, where available, the Court should apply the most analogous offense guideline. The most analogous offense to seditious conspiracy is Treason, under U.S.S.G. 2M1.1. For this particular defendant, in this particular case, U.S.S.G. 2Ml.l(a)(2) applies, which further directs the Court to select the base offense level applicable to the most analogous offense applied to the defendant's specific conduct. In this case, "Obstruction of Justice" under U.S.S.G. 2J1.2 is the most analogous offense for this defendant's specific conduct. *See* ECF No. 31 at ¶126. This puts the

base level for both counts at 14.

        b.  Extensive Scope, Planning, and Preparation

The parties agreed under the terms of the plea agreement, ECF No. 3 at 3, that Wilson's offense involved extensive scope, planning, and preparation, under U.S.S.G. § 2J1.2(b)(3)(C). As this Court found at the sentencing hearings for Wilson's co-conspirators in *United States v. Rhodes, et al.*, No. 22-cr-15, and *United States v. Parker*, et al., No. 21-cr-28:

> Clearly there was extensive scope and planning for the events of January 6th. Even if we take the time period simply from December 19th forward, there's extensive scope and planning in terms of gathering people, making arrangements for transportation, hotel, bringing of weapons, and creating of groups to operate on that day. And then, of course, planning and preparation in terms of going into the building was exhibited by the way in which people entered in groups—that is planning and preparation, and shows organization.

5/25/23AM Tr. at 76. Indeed, the facts admitted by Wilson in the statement of offense he adopted as part of his plea, as well the evidence introduced in the related *Rhodes* and *Parker* trials, established that Wilson participated in a conspiracy that was extensive in both its objective and size. A total of 25 individuals have been convicted for their roles in this conspiracy: seven defendants from the *Parker/Crowl* case, nine defendants in *Rhodes*, co-conspirators Jonathan Walden and Kellye SoRelle, who recently pled guilty, and seven cooperating co-conspirators (including Wilson). The conspiracy and its attendant conduct was protracted, lasting from December 2020 through January 2021. The members of the conspiracy, including Wilson, communicated with each other using sophisticated encrypted messaging applications, email servers, and meeting platforms. They also coordinated with one another to travel across the country from Arizona, Texas, Alabama, Georgia, Florida, Ohio, Indiana, North Carolina, Virginia, and elsewhere into the D.C. area. The presence of the armed QRF staged miles from the Capitol

building at a hotel in Virginia, armed with firearms and other weapons collected from numerous persons, also shows the extensive scope of the offense. Finally, the scope of the conspiracy's objective was itself enormous: to forcibly prevent an entire branch of the federal government from performing its constitutional and statutory duties.

       c.   <u>Obstruction/Destruction of Evidence</u>

The PSR and parties correctly determined that this Court should apply Section 3C1.1's two-level enhancement for obstruction of justice. This enhancement applies if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." U.S.S.G. § 3C1.1. The commentary to the Guidelines includes a non-exhaustive list of some of the ways that a defendant can obstruct justice, including by deleting evidence or instructing others to do so, or attempting to do so. U.S.S.G. § 3C1.1, cmt. n. 4(D). Here, Wilson admitted through his guilty plea that he prevented certain evidence from being backed up to his iCloud, and he threw his phone into the Ocean to destroy the evidence—messages, photos, videos—stored on it.

       d.   <u>Grouping</u>

Counts One and Two are grouped together into a single group under U.S.S.G. 3D1.2(c). Because Count 1, Seditious Conspiracy, and Count 2, Obstruction of an Official Proceeding, have the same offense level as calculated above for this particular defendant, that offense level constitutes the combined offense level for both counts.

e. <u>Terrorism</u>

As in the *Rhodes* and *Parker* sentencings, the Court should apply an upward adjustment because Wilson committed offenses that were calculated to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct. Wilson was an active participant in the Oath Keepers' conspiracy to forcibly oppose the lawful transfer of power from Donald Trump to Joseph Biden.

Note 4 to Section 3A1.4 provides that an upward departure is "warranted" if the defendant's "offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4, cmt. n.4(A). When it adopted Note 4, the Sentencing Commission explained that it is "an *encouraged, structured upward departure,*" the purpose of which is to provide courts with "a viable tool to account for the harm involved during the commission of these offenses on a case-by-case basis" and to "make[] it possible to impose punishment equal in severity to that which would have been imposed if the § 3A1.4 adjustment actually applied." Sentencing Guidelines, App. C, amend. 637 (2002) (emphasis added).

Wilson's conduct was clearly "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4., cmt. n.4. A defendant's offense is so "calculated" if that offense was specifically intended to have the effect of influencing, affecting, or retaliating against government by force or the threat of force. *See, e.g., United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012). As this Court observed in sentencing the defendants in the related *Rhodes* matter, "[I]t is challenging to find that in a case where individuals were convicted of participating in a [] conspiracy to stop the lawful transfer of

power after a United States Presidential election, that they plotted to use force in so doing—it is very hard to not see that as terrorism within the definition certainly at least Note 4. That is certainly conduct that is calculated or intended to result in the coercion and intimidation of the government in order to achieve some purpose." 5/25/23AM Tr. at 36.

So, too, with Defendant Wilson. On January 6, he breached the Capitol as part of a conspiracy to use force to stop the lawful transfer of presidential power. Prior to and on January 6, he made statements and took actions that showed the object of this force was to influence or affect the conduct of the government by intimidation or coercion, and to retaliate against government conduct. He admitted, through his guilty plea, that he entered the Capitol with the goal of disturbing the certification proceeding. ECF 4 at ¶33. Thus, like his co-conspirators in the *Rhodes* matter, Wilson's conduct was calculated to influence or affect the actions of government through intimidation and coercion, and to retaliate against government conduct and thus, the Court should apply an upward departure under Note 4. Accordingly, applying the same framework the Court used for determining the appropriate sentencing ranges for the other co-conspirators, the governments seeks an upward departure of one level for Defendant Wilson.

> f.   Acceptance of Responsibility

With respect to applicable downward adjustments to Wilson's Sentencing Guidelines range, a 2-level reduction is appropriate, pursuant to U.S.S.G. § 3E1.1, because the defendant has clearly demonstrated his acceptance of responsibility, and an additional 1-level reduction is appropriate, pursuant to U.S.S.G. § 3E1.1(b), because the defendant has assisted authorities by providing timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

g. <u>"Zero-Point" Offender</u>

The Court should not, however, apply U.S.S.G. § 4C1.1, the so-called "zero-point-offender downward adjustment" to this case. Recent amendments to the Sentencing Guidelines for 2023 added § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Under Section 4C1.1(a)(3), however, the adjustment should not be applied to defendants who use violence or credible threats of violence in connection with their offense. "In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions. So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction." *United States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12.

Here, Wilson's presence and conduct in part caused the continued interruption to Congressional proceedings; thus, the court should find that the defendant in fact impeded or disrupted the orderly conduct of Government business or official functions. While Wilson did not personally engage in violence, he joined the mob that forced entry into the Capitol while personally armed with a knife, and thus participated in violence that should disqualify him from this adjustment. He also participated in a seditious conspiracy to oppose by force the lawful transfer of

presidential power and brought his own firearms and ammunition to the D.C. area in support of this conspiracy. Due to the unique nature of the January 6 mob, the harms caused and posed by the seditious conspiracy Wilson joined with Rhodes and others, and the significant need to deter future conspiracies from using force to seek to alter the results of elections, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, and the seditious conspiracy in which Wilson participated, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.[1]

To avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.

### h.   Total Offense Level Before Departures

For the forgoing reasons, the Sentencing Guidelines' total offense level, is:

Count One and Count Two: 18 U.S.C. §§ 2384, 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(3)(C) | Extensive Scope, Planning, or Preparation | +2 |
| U.S.S.G. § 3C1.1 | Obstruction (destroying documents) | +2 |
| U.S.S.G. § 3A1.4, n.4(A) | Terrorism | +1 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -3 |
| | **Total** | **16** |

---

[1] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

In sum, based on this Sentencing Guidelines analysis, the defendant is at level 16 prior to any upward or downward departures.

### B. Upward Departures

As this Court has observed in a related case, "§ 2J1.2 does not adequately account for the seriousness of convictions for seditious conspiracy" and related offenses, and it also "does not account for an unprecedented day like January 6." No. 22-cr-15, ECF No. 877. Chapter 5, Part K of the Guidelines "identifies some of the circumstances that the Commission may have not adequately taken into consideration in determining the applicable guideline range," and suggests that "if any such circumstance is present in the case and has not adequately been taken into consideration in determining the applicable guideline range, a departure consistent with 18 U.S.C. § 3553(b) and the provisions of this subpart *may* be warranted." U.S.S.G. § 5K2.0(a)(2)(A). There are at least two such identified circumstances present here: disruption of a governmental function (Section 5K2.7), and the use or possession of weapons in the commission of the offenses (Section 5K2.6). The Court is not required, however, to depart upwards because of the presence of these factors. Rather, "Departures permit courts to impose an appropriate sentence in the exceptional case in which mechanical application of the guidelines would fail to achieve the statutory purposes and goals of sentencing." U.S.S.G. § 5K2.0, cmt. 5. For the reasons set forth in the application of the Section 3553(a) factors below, this case does not require an upward departure because, notwithstanding the grave nature of the offenses at issue here, the statutory purposes and goals of sentencing can be achieved in this case without applying an upward departure.

### C. Downward Departure

The government moves, pursuant to U.S.S.G. § 5K1.1, for a downward departure of three levels for the substantial assistance Wilson has provided to law enforcement. The Guidelines provide that, "Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1. In determining the appropriate level of reduction to apply, the Court should consider the following factors:

> (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>
> (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
> (3) the nature and extent of the defendant's assistance;
>
> (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;
>
> (5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a).

Here, the fifth factor clearly applies and can be quickly addressed. Wilson was cooperative when he was first approached by law enforcement in June 2021. Law enforcement agents approached Wilson at his home, and he agreed to be interviewed by them. After the interview, he retained counsel, continued to proffer with the government, and very quickly agreed to plead guilty pursuant to a public cooperation plea agreement. When the government was prepared to enter into that agreement, Wilson accepted, waived his right to be indicted, and pled guilty pursuant to a criminal Information that charged him with some of the most serious offenses relating to the

January 6 attack on the Capitol. Thus, Wilson's cooperation has been extremely timely. U.S.S.G. § 5K1.1(a)(5).

This cooperation was not without risks. To plead guilty pursuant to a public cooperation plea agreement in a case that has garnered such national interest and, sadly, controversy, took courage on Wilson's part. While the government is not aware of any direct threats to Wilson or his family, other individuals who cooperated publicly with the government in this investigation have received such threats. Thus, this court should give Wilson credit for the danger and risk of injury to himself and to his family that resulted from his entry into a public cooperation plea agreement in this case. U.S.S.G. § 5K1.1(a)(4). It is also worth noting that Wilson pled guilty to the charge of seditious conspiracy, and was one of the first to do so, and he did so prior to being arrested by the government, even though he knew that it would result in the immediate and permanent termination of his military disability and retirement benefits.

With respect to the significance and usefulness of the defendant's assistance (the first and third factors), the defendant provided information about the leader and other members and affiliates of the Oath Keepers who conspired to participate in the attack on the Capitol and interfere with the lawful transfer of power on January 6. By their nature, criminal conspiracies are challenging to prove without information from individuals on the inside—co-conspirators like Wilson who were privy to communications in furtherance of that conspiracy and could give color and context to their meaning.

Wilson provided much helpful information that supplemented the government's investigation into this conspiracy. Wilson provided information to the government over multiple lengthy proffer sessions, including in Washington DC. He also sat down with prosecutors several

times to prepare for trial. Wilson gave candid answers to difficult questions about his own involvement and the involvement of Rhodes and other co-conspirators. The government's knowledge of Rhodes, his state-of-mind, and how he was able to inspire followers like Wilson was enhanced from Wilson's cooperation. Critically, his account helped to fill in gaps in the government's understanding about the chronology of events between January 5 and 6. Significantly, Wilson provided all this information without the protection of a proffer letter; his statements could therefore be used against him.

Some of Wilson's information came from personal conversations with Rhodes. Among them was a conversation with Rhodes in the lead up to January 6 in which Rhodes directed Wilson to "come prepared for anything," and to bring his weapons. Another occurred on January 5 when Rhodes told Wilson that a QRF would remain on standby if needed the next day. Wilson also helpfully recounted various times when Rhodes discussed the Insurrection Act as a means for militias like the Oath Keepers to participate in stopping the transfer of power. Wilson acknowledged bringing weapons to the area and, if necessary, his willingness to engage in violence at Rhodes' command for this reason.

Wilson also provided valuable information about what Rhodes and other conspirators did after attacking the Capitol. He was in the room at the Phoenix Hotel hours later when Rhodes spoke over the phone with an unidentified individual in apparent close proximity to former President Donald Trump. Wilson consistently recounted how Rhodes pressured this individual to get the former President to invoke the Insurrection Act. Wilson also gave further insight into the dinner he attended that night at the Olive Garden with Rhodes and Oath Keeper members, and detailed obstructive conduct by co-conspirator Kellye SoRelle.

Finally, the nature and extent of Wilson's assistance has been significant, U.S.S.G. § 5K1.1(a)(3). Mr. Wilson provided the information over the course of numerous debriefing swiht the government. Wilson also provided testimony to the grand jury regarding all of these matters.

That said, Wilson's cooperation was not as significant as it could have been, because Wilson's cooperation unfortunately has not always been completely truthful, U.S.S.G. § 5K1.1(a)(2). When Wilson was first interviewed by law enforcement, he denied going inside the Capitol. Additionally, Wilson has given several contradictory accounts about how his cell phone (the one that contained evidence of the instant offenses) came to be lost or destroyed, and suggested that he only told law enforcement that he intentionally got rid of the phone because that is what he thought the government wanted to hear.[2] These statements significantly diminished Wilson's credibility. At the same time, the government is sensitive to the fact that these contradictory statements were made during an incredibly stressful time, the day after Wilson pled guilty during a public proceeding that received a fair amount of media attention, several weeks after Wilson suffered a brain injury, and amidst ongoing struggles by the defendant with mental health issues.

Taking all of these factors into account, a downward departure of three levels would appropriately reflect the principles outlined above that this Court should consider in assessing the

---

[2] In his first interview with law enforcement, on June 30, 2021, Wilson told law enforcement that his phone accidentally fell into the Atlantic Ocean while he was fishing. During an interview on November 3, 2021, Wilson admitted that he intentionally threw his phone into the ocean, and explained that the only he did not do so immediately after January 6 was that he had to wait until he was paid at work to be able to afford the $200 deductible for the new phone. Then, the day after Wilson pled guilty, he informed his attorney that his phone actually did accidentally fall into the Atlantic Ocean in January of 2021. Wilson advised the phone was knocked out of a hunting coat pocket by the end of his fishing rod, bounced twice and fell into the ocean. Later that same day, Wilson met with law enforcement and, when asked what happened to his phone, stated that he intentionally hit the phone with his fishing rod, which caused it to fall into the ocean. But then, after a break, Wilson advised he did not intentionally cause the phone to fall into the ocean.

level of assistance Wilson provided to law enforcement. Such a departure would constitute a roughly 19 percent reduction from the level 16 adjusted offense level applicable here for the reasons stated above. It is also comparatively appropriate to the departures requested by the government for cooperating co-conspirators in related cases (with the government requesting a seven-level departure for defendants Caleb Berry, Jason Dolan, and Graydon Young; a five-level departure for Brian Ulrich; and a four-level departure for Mark Grods).  In sum, a three-level departure adequately accounts for the assistance provided by Wilson to law enforcement in this matter.

### D.    Sentencing Guidelines Recommendation

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR, ECF No. 31 at ¶ 9. Accordingly, the defendant's total adjusted offense level, should the Court apply departures under Chapter 5 as proposed above, would be level 13. At that level, the recommended Sentencing Guidelines ranges would be 12-18 months of incarceration. For the reasons discussed above and below, the government submits that a sentence of 12 months of incarceration would appropriately reflect the nature of these offenses, the need for deterrence, the defendant's history and characteristics (including his cooperation in this matter), and the other factors this Court must consider at sentencing.

## VII.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the government's recommended sentence.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Wilson's conduct on January 6, 2021 was

part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Perhaps even more alarmingly, these actions were not spontaneous for Wilson and his co-conspirators—they were in furtherance of a seditious conspiracy hatched weeks earlier to take any means necessary, up to and including the use of force supported by firearms, to stop the lawful transfer of power from Donald Trump to Joseph Biden. Wilson came to D.C. understanding the potential for, and in many ways hoping to participate in, a forcible interruption of the certification of the election. He wanted to fight and brought weapons to support the effort. And he ultimately joined the violent mob that breached the Capitol in furtherance of this conspiracy. The nature and circumstances of Wilson's offense were of the utmost seriousness, and fully support the government's recommended sentence of 12 months of incarceration.

### B.  The History and Characteristics of the Defendant

At the time of this offense, Wilson was gainfully employed. He had no criminal history. He is a veteran. In other words, the defendant's crimes on January 6 were an isolated incident in an otherwise law-abiding life, although that fact also suggests Wilson should have known better and makes his conduct on January 6 hard to comprehend.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports the significant period of incarceration—12 months—recommended by the government. Wilson's participation in a seditious conspiracy to forcibly oppose the lawful transfer of power and certification of a presidential election, coupled with his ultimate conduct on January 6, are the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

A sentence of 12 months of incarceration is appropriate in this case "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] At the same time, early and public acceptance of responsibility, coupled with substantial cooperation with law enforcement, is something that should be rewarded, to encourage others to take similar responsibility for their conduct on January 6. For these reasons, a three-level or 19 percent reduction from the Guidelines range Wilson would have otherwise faced, which still results in a significant sentence of incarceration, achieves the goal of general deterrence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. The government is recommending a Guidelines-compliant sentence, should the Court apply the government's recommended departure for substantial assistance to law enforcement.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). The government's recommended sentence does not create unwarranted disparities when one considers the nature of Wilson's conduct, coupled with the fact that he accepted responsibility at the earliest possible time to very serious charges and provided substantial assistance to law enforcement.[4]  .

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN

This recommended sentence would also treat Wilson comparably to the cooperating defendants in related cases who have been sentenced. To date, seven cooperating defendants have been sentenced (James Breheny, Jon Schaffer, Caleb Berry, Graydon Young, Jason Dolan, Brian Ulrich, and Mark Grods). All have received terms of probation, although some received periods of home confinement as a condition of probation. Wilson stands apart from these other cooperating defendants because of his waffling about whether he intentionally got rid of his cell phone to destroy evidence of his involvement in these offenses. Were that factor not to have existed, Wilson would have been most similarly situated to Brian Ulrich, who also pled guilty to seditious conspiracy and obstruction of an official proceeding. Ulrich and Wilson faced the same Sentencing Guidelines range prior to a downward departure for substantial assistance. But Wilson's cooperation was far less substantial: the credibility concerns raised by his repeatedly changing his account of what happened to his cell phone, made it very difficult for the government to sponsor him as a witness. In contrast, Ulrich provided credible and compelling testimony at a trial of four of his co-conspirators. The government's decision to recommend a three-level downward departure for Wilson, versus a five-level downward departure for Ulrich, is the result of that difference in the extent and nature of their cooperation.

## VIII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

---

CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of May 2021. ECF 57 at 9. That estimate is far higher now.[6] Defendant Wilson did not personally cause any injuries to any officers or any damage to any property. However, the parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Wilson must pay $2,000 in restitution,

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[6] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

which reflects in part the role he played in the riot on January 6.[7] ECF 57 at 9. Wilson's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 8, n.4.

## IX. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 12 months of incarceration, to be followed by three years of supervised release, with the special condition that the defendant pay $2,000 in restitution and the mandatory $200 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     _____
Kathryn L. Rakoczy
D.C. Bar No. 994-559
Assistant U.S. Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
(202) 252-6928
Kathryn.Rakoczy@usdoj.gov

---

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).